FILED

01/13/2017

Clerk of the
Appellate Courts



IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 8, 2016

**STATE OF TENNESSEE v. WILLIAM HENRY SMITH, JR.**

**Appeal from the Circuit Court for Bedford County**
**No. 18080    Forest Durard, Judge**

_____

**No. M2016-01475-CCA-R3-CD**

_____

A Bedford County jury convicted the Defendant, William Henry Smith, Jr., of conspiracy to sell and deliver a Schedule II drug, and the trial court sentenced him to fifteen years of confinement.  On appeal, the Defendant asserts that the evidence against him is insufficient to support his conviction.  After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Andrew Jackson Dearing, III, Shelbyville, Tennessee, for the appellant, William Henry Smith, Jr.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Robert J. Carter, District Attorney General; and Michale D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Bedford County grand jury indicted the Defendant for conspiracy to sell and deliver a Schedule II drug.  At trial, the parties presented the following evidence:  Jose Ramirez, a Marshall County Sheriff's Department deputy, testified that he was assigned to the 17th Judicial District Drug Task Force.  During the course of his work with the Task Force, Agent Ramirez became familiar with the Defendant.  He said that the Defendant was also known by the street name, "Rat."  Deputy Ramirez identified the Defendant in court.

Agent Ramirez testified that on March 20, 2014, he participated in a Drug Task Force investigation that targeted the Defendant and another individual, Kavaris Kelso. For this operation, the officers worked with a female confidential informant ("CI"). The CI arranged to purchase an ounce and a half of cocaine for $2,200 from the Defendant and Mr. Kelso. Agent Ramirez, while at the CI's motel room in Shelbyville, searched the CI's person, room, and vehicle for contraband, large sums of money, and weapons before the drug transaction, and found none.

Agent Ramirez testified that a controlled buy is an illegal drug transaction that is monitored by the law enforcement. Normally, a CI is searched, wired for recording or audio monitoring of the drug transaction, and provided with recorded money for later identification. In this case, the Drug Task Force altered the normal course of a controlled buy and elected to do a "bust." Agent Ramirez explained that a "bust" is when officers interrupt the transaction before the actual sale occurs and take the parties into custody. Based upon the decision to intercede in the drug transaction before its completion, the CI was not provided with money; however, she was still provided with a recording device.

Agent Ramirez testified that, while still at the CI's motel room before the transaction, officers instructed the CI to place a telephone call to the Defendant to confirm the drug transaction. Officers recorded this phone call, and the State played the recording for the jury. Agent Ramirez identified the CI's and the Defendant's voices on the recording. In the recording, the CI can be heard asking whether she needed to come and get the Defendant or if he planned to meet her at her motel room. The Defendant responded that he would come to the motel room where he would "dial him up." The CI understood the Defendant's reference to "him" to be Mr. Kelso.

Agent Ramirez testified that officers placed a recording device on the CI so that Assistant Director Miller could monitor the transaction in real time. Agent Ramirez, along with other officers, conducted surveillance of the transaction. Agent Ramirez drove his vehicle across the street where he could view the CI's motel room and the "general area." Agent Ramirez observed the Defendant walk down North Main, turn into the motel property, and then enter the CI's motel room. After a period of time the CI and the Defendant exited the CI's room and entered the CI's vehicle. Law enforcement officers monitored the CI and Defendant's route as they drove around "town." The CI drove and they took a circuitous route, for approximately thirty minutes, to the Bedford Manor Apartments in Shelbyville, Tennessee. These apartments were approximately two miles from the CI's motel.

Agent Ramirez testified that the CI parked the vehicle at the Bedford Manor Apartments, and, a short time later, the CI departed alone in the vehicle. Agent Ramirez followed the CI while the other officers remained in position near the Bedford Manor

Apartments. After a short distance, Agent Ramirez flagged the CI over to find out why she had left. While speaking with the CI, Agent Ramirez observed a cell phone in the vehicle that the CI indicated was the Defendant's phone. The phone began ringing, and the CI answered the phone. The CI spoke briefly with Mr. Kelso, the caller. Shortly thereafter, other agents arrested Mr. Kelso and the Defendant at the Bedford Manor Apartments.

The CI testified that in March 2014, she lived in Georgia. The CI identified the Defendant in court and confirmed that his "street name" was "Rat." The CI and the Defendant attended the same grade school, although they were not in the same grade. Several months before the incident resulting in the Defendant's arrest in this case, the Defendant had contacted the CI through Facebook, a social media website. The two sent messages back and forth through Facebook and spoke on the phone "a few times." During these conversations, the Defendant asked if the CI would "use him as [her] connect" for drugs rather than previous sellers from whom she had purchased drugs. The Defendant said he "could get [her] a good deal" on cocaine.

The CI testified that the Defendant knew she planned to be in Shelbyville in March 2014, and they had discussed the CI buying drugs from him. The Defendant sent the CI a text message on March 19, to confirm the drug sale on March 20. She recalled that originally she had arranged to purchase two ounces but "it ended up being an ounce and a half." She had agreed to pay $2,200 for an ounce and a half. The CI met with the Defendant and Mr. Kelso on March 20, 2014, at a residence "behind Harris School." Mr. Kelso came outside to her car and she, the Defendant, and Mr. Kelso discussed where to meet to sell the drugs and at what time. The CI explained that they did not "do the transaction" right then because she was "not trying to do it as a real deal." She said that she was waiting for the "initial deal with the DTF." The CI wanted to speak with the Drug Task Force first to make them aware of the details of the transaction.

The CI testified that, during this meeting with the Defendant and Mr. Kelso, she learned that Mr. Kelso "was the actual connect" for the Defendant. The Defendant was the "middleman" who would deliver the drugs to the CI and take her money. The CI stated that it was at this meeting that she first learned of Mr. Kelso's involvement and role in the drug transaction. Mr. Kelso made a phone call to another individual and asked them to bring the cocaine from Tullahoma, Tennessee. This person arrived while the CI was there, but the CI left because she wanted to meet with the Drug Task Force officers first. She told the Defendant and Mr. Kelso that she needed a couple hours to make arrangements for her children and to obtain the rest of the money from another person.

The CI testified that she met with Tim Miller and other DTF agents and relayed the plan she had made with the Defendant and Mr. Kelso. An agent searched her, her

vehicle, and her motel room before agents instructed her to call the Defendant. Her understanding of the transaction was that Mr. Kelso would give "the product" to the Defendant, who in turn would give "the product" to the CI. The CI was to give the money to the Defendant. The State played the recorded phone call for the CI, and she identified her voice and the Defendant's voice in the recording. In the recording the Defendant refers to calling "him." The CI explained that, once the Defendant was with the CI, he was to call Mr. Kelso, who would provide directions to where they would meet.

The CI testified that, when the Defendant arrived at her motel room, he told her that he had observed police following him. The Defendant told her that he walked toward the officers, who then "took off." The Defendant also wanted the CI to give him the money, saying that he would go and get the cocaine and bring it back. The CI said that she told the Defendant she wanted to be present during the transaction due to the large sum of money involved. The Defendant and the CI exited the motel room and got into the CI's rental car. The CI said that she drove at the Defendant's direction. The Defendant would not reveal the destination but would only tell her when to turn as they drove. They made several stops during the drive, the first at Park Trail Apartments. During the drive, the Defendant continued to talk about "the police and stuff." Next, they stopped at a gas station because the CI's car was low on gas by this point. While in the gas station, she called DTF Agent Tim Miller and told him that the Defendant was "very paranoid" and she was not sure how "this might go." The Defendant accused her of being a police officer "several times" and even threatened to kill her if she was working with the police. The Defendant patted her down and pulled up her shirt.

The CI testified that they eventually arrived at the Bedford Manor Apartments. Once at the apartments, the Defendant tried to convince the CI to let him take the money and return with the cocaine. Again the CI refused, telling the Defendant to go and get the drugs and put them in the trunk and the money would be in the trunk. The Defendant patted her down and checked her phone. The CI reiterated her plan for the Defendant to go and get the cocaine and she would release the trunk when he returned. She assured him that he would find the money in a suitcase in the trunk so that there was no "hand-to-hand transaction." The Defendant maintained that she should give him the money, and he would return with the cocaine. The two argued for ten or fifteen minutes before the Defendant exited the vehicle

The CI testified that as she and the Defendant sat in the car arguing, she grew nervous and "uneasy." There were lots of people in the area, and she saw Mr. Kelso and another man she did not recognize standing nearby. She described the apartments as having "a bad aura," and so after the Defendant exited the rental car, she drove away. After leaving, she realized the Defendant's cell phone was still in her car. Earlier, as they

4

drove around, the Defendant complained that his phone battery was very low. The CI offered to let him use her car charger, and the cell phone was still charging when she drove away. After leaving, she met with Agent Ramirez, and Mr. Kelso called the Defendant's cell phone that was still in the rental car. The CI answered the phone and told Mr. Kelso that she was nervous and how she believed Mr. Kelso and the Defendant were going to rob her. Mr. Kelso told the CI that "everything was cool," and described where the cocaine was located between the fender and the tire of a specified vehicle. Mr. Kelso encouraged her to return, assuring her that he would complete the transaction himself.

The CI testified that, while on the phone with Mr. Kelso, she could hear the Drug Task Force members through Agent Ramirez's radio saying that they could see the drugs and, thus, her involvement in the transaction ended. The CI confirmed that her interaction with the Defendant was recorded, and the recording was played for the jury. The contents of the conversations with the Defendant are consistent with her testimony. While in the hotel room, the Defendant answered a phone call and asked the CI, "What you got?" To which the CI responded, "21." She explained that she was referring to money at the time and meant that she had $2,100[1] to exchange for the ounce and a half of cocaine. Also on the recording, the CI told the Defendant, "It's a lot of money." He responded, "It's a lot of quantity."

On cross-examination, the CI agreed that she had a 2008 conviction for theft of property valued over $1,000 and a 2015 conviction for misdemeanor possession of a Schedule III drug. She further confirmed a 2013 charge for conspiracy to distribute a Schedule I drug and a 2015 charge for felony possession of a Schedule I, both of which were later dismissed. She said that she first met with members of the Drug Task Force in July or August 2013. The CI agreed that she did not see the Defendant with any drugs during the course of their interaction on March 20, 2014.

Tim Miller, a Bedford County Sheriff's Department deputy, testified that he had been assigned to the Drug Task Force for almost sixteen years. Agent Miller recalled that the CI contacted him some time before March 20, 2014, to notify him that she had been in contact with "these individuals." He advised her to "iron those details out" and then contact him. On March 20, 2014, she met with Agent Miller and provided him with the details of the impending drug transaction. Agent Miller said that the CI was to buy an ounce and a half for $2,100. Agent Miller decided that, in this case, once the drugs were in view of an officer, the officers would "move in" and arrest the Defendant and Mr. Kelso before the transaction was complete.

---

[1] The CI testified that the negotiated amount was $2,200. For the sake of accuracy, we recite the amounts as testified by each witness.

5

Agent Miller testified that the CI was wired with a recorder during her interactions with the Defendant but that he was also monitoring the interaction in "real time" through the CI's telephone. Agent Miller positioned himself so he could observe the CI's motel room. He watched as the Defendant approached the room, entered, and then later left with the CI in her rental car. Agent Miller said that there were multiple unmarked Drug Task Force vehicles that were conducting surveillance of the CI as she drove the Defendant around town. He confirmed that the CI called him from a gas station, and, based upon what she told him, he thought the operation was likely over.

While Agent Miller was in a surveillance position approximately a hundred yards from where the CI parked at the Bedford Manor Apartments, he continued monitoring the interaction. Agent Miller quickly noticed three males, one of which was Mr. Kelso, standing approximately ten yards in front of the CI's vehicle. He also observed that there were a lot of people outside and around the apartments that day. After a "short time" he observed the Defendant exit the CI's rental car and approach the three men, and then the CI backed out of the parking space and left. Almost immediately the CI communicated with Agent Miller on the phone, relaying the threats and the search of her person for a recording device. Agent Miller described the CI as "shaken up;" however, since Agent Ramirez was with her, Agent Miller turned his attention back to the Defendant and Mr. Kelso.

Agent Miller testified that the men were standing together talking and then Mr. Kelso made a phone call. When he finished the phone call, he walked "suspiciously" toward a black sedan parked closer to Agent Miller's surveillance position. Agent Miller faced the driver's side of the car. He watched as Mr. Kelso walked down the passenger side of the car, knelt down at the back quarter panel next to the back tire, and reached under the body of the car. After doing so, Mr. Kelso stood up, looked "hard up and down the streets again" and, as he walked away, Agent Miller saw a "fairly good sized bag of white powder" in Mr. Kelso's hand. Mr. Kelso tucked the bag of white powder into his clothing and then returned to his position next to the two men and the Defendant.

Based upon these observations, Agent Miller ordered the other agents to "move in and make the arrest." During the arrest, officers confiscated from Mr. Kelso a cell phone, approximately $232 in cash, and an ounce and a half of cocaine. Agent Miller testified that officers arrested Mr. Kelso and the Defendant but that they did not arrest the other two men at the scene because there was insufficient evidence to link them to the offense.

On cross-examination, Agent Miller confirmed that he did not see any drugs in the Defendant's hand.

6

Laura Cole, a Tennessee Bureau of Investigation special agent forensic scientist, testified as an expert witness in the field of forensic chemistry. Ms. Cole analyzed the white powdery substance retrieved from Mr. Kelso and determined that it weighed 40.62 grams. She noted that an ounce and a half is 42.5 grams. Ms. Cole conducted three different tests to confirm what the substance contained. The first test was not conclusive but the results of the next two tests indicated that the substance was cocaine.

After hearing this evidence, the jury convicted the Defendant of conspiracy to sell and deliver a Schedule II drug, and the trial court sentenced him to fifteen years of confinement. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence supporting his conviction for conspiracy to sell and deliver a Schedule II drug is insufficient because the evidence was highly circumstantial and did not clearly show his intentions. The State responds that there was sufficient evidence to support the conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact

from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant was charged and convicted of conspiracy to sell cocaine. T.C.A. § 39-17-417(a)(3) (stating it is an offense for a person to knowingly sell a controlled substance); T.C.A. § 39-17-408(b)(4) (defining cocaine as a controlled substance); T.C.A. 39-12-103(a) (defining conspiracy). Conspiracy requires:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.
>
> (b) If a person guilty of conspiracy, as defined in subsection (a), knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense,

8

the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

(c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship.

(d) No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

T.C.A. § 39-12-103(a)-(d). To prove the existence of a conspiratorial relationship, the State may rely upon a "mutual implied understanding" existing between or among the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). The conspiracy need not be proven by production of an official or formal agreement, in writing or otherwise. *Id*. The conspiracy may be demonstrated by circumstantial evidence and the deportment of the participants while undertaking illegal activity. *Id*. Conspiracy connotes harmonization of design, not coequal participation in the minutia of every criminal offense. *Id*.

The evidence, viewed in the light most favorable to the State, shows that the Defendant negotiated with the CI to sell her an ounce and a half of cocaine. The Defendant and the CI knew each other from grade school and communicated via Facebook where the Defendant first sought to sell the CI drugs. When the CI was in Shelbyville, the Defendant contacted the CI via text to confirm the arrangement they had made regarding a drug sale. The following day, the CI met with the Defendant and, for the first time, Mr. Kelso to discuss more details of the transactions. Following this meeting, the CI met with police, who thoroughly searched her and provided her with a recording device. The CI then contacted the Defendant who agreed to meet the CI in her motel room where he was to call Mr. Kelso to learn the exact location of the transaction. After the Defendant spoke with Mr. Kelso, the Defendant and the CI left the motel and got into her rental car. The CI drove the Defendant, at the Defendant's direction, in a circuitous route around town for approximately a half hour before ultimately arriving at the Bedford Manor Apartments.

At the motel room, throughout the drive, and once at the apartment complex, the Defendant attempted to convince the victim to give him the money, saying that he would get the drugs and bring them back to her. At the apartment complex, Mr. Kelso stood near the car as the Defendant negotiated how the exchange should occur. This evidence supports a jury conclusion that the Defendant and Mr. Kelso were acting in concert to sell cocaine to the CI. The Defendant knowingly solicited, negotiated, and arranged for the

9

drug sale. He provided directions, access to Mr. Kelso, and was the person designated to literally hand the drugs over to the CI.

Accordingly, we conclude that there was evidence, beyond a reasonable doubt, from which a jury could find the Defendant guilty of conspiracy to sell and deliver a Schedule II controlled substance. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the evidence is sufficient to support the Defendant's conviction. Therefore, we affirm the trial court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE